STATE OF NEW YORK
SUPREME COURT                                         GREENE COUNTY

DOMINICK CANNAVO,

          Plaintiff,            **DECISION AFTER NON-JURY TRIAL**

    - against -                          Index No.:    12-1132
                                     RJI No.:    19-12-6571

DANIEL HENKE D/B/A HENKE CYCLE REPAIR, AND
ALLEN VEVERKA,

          Defendants.

PRESENT: HON. LISA M. FISHER:

APPEARANCES:        Paul M. Freeman, Esq.
                      *Counsel for Plaintiff*
                      Freeman Howard, P.C.
                      441 East Allen Street
                      P.O. Box 1328
                      Hudson, New York 12534

                      K.J. McGuire, Jr.
                      *Counsel for Defendant,*
                      *Daniel Henke d/b/a Henke Cycle Repair*
                      710 Brunswick Road
                      Troy, New York 12180

FISHER, J.:

    This action arises from a series of alleged agreements between Plaintiff and Defendants during the years 2002 and 2012 for the purchase, repair, and restoration of certain antique motorcycles.  Plaintiff Dominick Cannavo, M.D. is a motorcycle collector residing in New York, New York.  He commenced this action on October 23, 2012 via Summons and Complaint against Defendant Daniel Henke, owner of Henke Cycle Repair, a motorcycle restoration shop in Cairo, New York.  Defendant Henke joined issue via Verified Answer on November 21, 2012, asserting four affirmative defenses and 15 counterclaims.

    Plaintiff amended the Summons and Complaint on November 30, 2012, and added causes of action against Defendant Allen Veverka, another motorcycle collector and owner of two businesses including a storage facility in Cairo, New York.  Defendant Veverka joined issue via Verified Answer on December 28, 2012, asserting seven affirmative defenses and two counterclaims.  Defendant Henke served an amended Verified Answer on or about December 20, 2012, repeating the affirmative defenses and counterclaims.

As for a general recitation of the facts, Plaintiff and Defendant Henke maintained a business relationship for approximately ten years wherein Defendant Henke would sell, act as a broker for the sale of motorcycles, evaluate motorcycles, and restore motorcycles for Plaintiff. The motorcycles were antique motorcycles, and the parties' course of dealing involved 13 motorcycles over the ten years. For several of these motorcycles, Defendant Henke allegedly acted as a broker between Defendant Veverka and Plaintiff. Defendant Henke and Defendant Veverka were friends since grammar school.

This matter was tried before this Court on March 30, 2016 through April 1, 2016. There were two motions *in limine* before this Court, both submitted and opposed in writing prior to the first day of trial. From the bench, the Court granted Plaintiff's motion to preclude Defendant Henke from offering any evidence or claiming any storage fees allegedly owed by Plaintiff to Defendant Henke. Plaintiff's second motion *in limine* was withdrawn. Defendant Henke requested a written decision, which the Court stated it would do so in the bench decision.

In the morning on the final day of trial, Plaintiff and Defendant Veverka reached an agreement whereupon Defendant Veverka will pay Plaintiff $92,500 and deliver the original title to the black 1947 Indian Chief motorcycle to Plaintiff. In return, Defendant Veverka will retain ownership of the red 1939 Indian Chief motorcycle in the storage unit at Rip's Storage. The parties exchanged general releases and agreed to file a stipulation of discontinuance as to the Amended Complaint and counterclaims. Therefore, all claims made against or by Defendant Veverka are resolved and moot for discussion herein.

At the conclusion of the bench trial, Defendant Henke moved for summary judgment which was opposed by Plaintiff. The Court reserved on such motion and permitted the parties to submit written summations. Post-trial memorandums of law and findings of fact/conclusions of law were required and due 30 days after the transcript was received. The matter was marked fully submitted on July 28, 2016.[1] This Court was not the IAS Court, and did not come with any knowledge of the facts or circumstances occurring during the pendency of this litigation.

---

[1] Neither party forwarded the transcript from the stenographer. The Court received the transcript from the stenographer on July 28, 2016.

### *Motions* in Limine

Plaintiff submitted two motions *in limine* to this Court prior to the first day of trial. The first one pertained to Defendant Henke's claim for storage fees which was ruled on from the bench, and the second pertained to Defendant Veverka which was later withdrawn. Defendant Henke contends there was an earlier motion before the IAS Court (Tailleur, A.J.), which denied Plaintiff's motion to preclude Defendant Henke from offering proof and seeking compensation for the bulk parts sale.

Defendant Henke contends that the Court could not logically deny Plaintiff's prior motion seeking to preclude evidence of the bulk parts, but grant the motion to preclude Defendant Henke on the storage fees. He contends that the original and amended Complaint were silent on Plaintiff's demand of $84,500 in payments Plaintiff wanted returned to him. However, it should be noted that when Plaintiff's counsel move to conform the pleading, Defendant Henke's counsel had no objection.

First, Defendant Henke cannot collaterally attack Justice Tailleur's decision or any holdings therein. The proper avenue would have been to reargue or appeal. Second, the Court disagrees and finds Defendant Henke's claim disingenuous and without merit. The original and amended Complaint made it crystal-clear Plaintiff was seeking return of payments for Defendants' various conduct in an amount "in excess of $500,000.00" in each cause of action. This was premised on the value of the motorcycles and on Plaintiff's payments to Defendants where Defendants allegedly did not perform. (*See, i.e.*, amended Complaint, ¶¶ 8, 13, 21, 25, 39, 42, 48, 60, 66, 73, 75, 85, and the wherefore clause.) There is no surprise or inability to defend on the merits for this $84,500 claim which was calculated through payments made to the Defendants, and the claim for damages from those payments was even noted in the *original* Complaint. Plaintiff provided documentary evidence of these payments, which Defendant Henke's testimony confirmed. Plaintiff thought these payments were for the 1939 motorcycle, wherein Defendant Henke thought these were for the bulk parts. Contorting his testimony will not be a viable shield from this claim, and it is proper for a review of the allegations and a determination by a trier of fact.

To the contrary, leading to the motion *in limine* for storage fees, Defendant Henke's Amended Answer sought actual damages in the amount of $3,105.80 on the first counterclaim, $5,400.00 on the second counterclaim, $3,545.87 on the third counterclaim, $3,708.62 on the fourth counterclaim, $460.00 on the fifth counterclaim, $485.00 on the sixth counterclaim, and punitive damages on the remaining counterclaims. This totals $16,705.29 in damages, a far cry from the $190,000.00 now claimed *in addition* to the $16,705.29 in damages on the eve of trial. Such claim was within Defendant Henke's knowledge but not disclosed or asserted until after disclosure and on the eve of trial. (*See Young v Zwack, Inc.*, 98 AD2d 913, 914 [3d Dept 1983]). There was no previous testimony as to any storage fees, and Defendant Henke even testified if the amount on the counterclaims were paid he would deliver the motorcycle corresponding with that fee to Plaintiff. There was no disclosure or investigation as to the storage fees, whereas there was disclosure for the payments made by Plaintiff to each Defendant during interrogatories and depositions.

Another big difference between Plaintiff and Defendant Henke's circumstances, acknowledged by Defendant Henke's post-trial submission, was Plaintiff *moved* to amend his Complaint to specifically conform the evidence to the $84,500.00. Notably absent from Defendant Henke's post-trial submission was when Plaintiff made such application at trial, Defendant's counsel actually stated he had no objection to Plaintiff "amending his allegations to the proof he believes has been heard." Whereas Defendant Henke did not move. From as far as the Court has observed, Defendant Henke's only claim for storage fees was in a letter demand to Plaintiff's counsel. No formal motion was made. No oral application was made. Plaintiff's motion to preclude with the IAS court was preemptory, and Defendant Henke did not cross-move to remedy.

As such, to permit Defendant Henke to now assert such counterclaim after such a significant passage of time since the transaction, without any prior warning, without any formal motion, and at this late juncture would prejudice Plaintiff and is properly precluded. (*See Ciarelli v Lynch*, 46 AD3d 1039, 1040 [3d Dept 2007].)

### *Relevant Pleadings*

### *Amended Complaint*

The Amended Complaint asserts seven causes of action against Defendant Henke and Defendant Veverka. Given the settlement between Plaintiff and Defendant Veverka, the Court finds it unnecessary to discuss specific claims or allegations asserted against Defendant Veverka.

The first cause of action is asserted against Defendant Henke for breach of contract, and alleges there was an agreement between Plaintiff and Defendant Henke for the restoration of 11 motorcycles. Defendant Henke took possession of the motorcycles and invoiced Plaintiff for the restorations. Plaintiff alleges to have paid in full all invoices to date, but Defendant Henke has failed to restore the motorcycles and return them to Plaintiff. Plaintiff seeks, *inter alia*, damages in excess of $500,000.00.

The second cause of action is asserted against Defendant Henke for replevin, and alleges Defendant Henke has wrongfully detained and still detains 11 unique, valuable, and rare motorcycles owned by Plaintiff which cannot be easily replaced. Plaintiff claims the value of such motorcycles is in excess of $500,000.00.

The third cause of action is asserted against Defendant Henke and Defendant Veverka for conversion, and alleges that Plaintiff is owner and entitled to immediate possession of 11 motorcycles he purchased from Defendants or motorcycles which were brokered through Defendants. Plaintiff avers to paying for such motorcycles and their subsequent restoration, but did not receive the motorcycles.

The fourth cause of action is asserted against Defendant Henke and Defendant Veverka for unjust enrichment, and alleges Defendants "illegally and tortiously usurped custody and control over plaintiff's property, against plaintiff's will and without his consent, thereby depriving plaintiff of the benefits of ownership thereof." Plaintiff also alleges that Defendants possibly sold portions of Plaintiff's property and kept the proceeds therefrom for themselves.

The fifth cause of action is asserted against Defendant Henke and Defendant Veverka for fraud and deceit, and alleges both Defendants participated together in a fraudulent scheme for the sole purpose of inducing Plaintiff to pay for at least four motorcycles to be restored by Defendant Henke, but which never occurred and were never returned to Plaintiff despite a demand to do so. Plaintiff seeks, *inter alia*, damages in excess of $500,000.00.

The sixth cause of action is asserted against Defendant Henke and Defendant Veverka for punitive damages, and seeks $1,000,000.00.

The seventh cause of action is asserted against Defendant Henke and Defendant Veverka for accounting, and alleges that Plaintiff is entitled to direct Defendants to account for any and all motorcycles in Defendants' possession which were purchased by Plaintiff, and account for any and all sums of money paid by and/or otherwise received from Plaintiff, either directly or indirectly, during the period of January 1, 2002 through the present.

Plaintiff's wherefore clause seeks either immediate return or, if possession cannot be given to Plaintiff, an amount to be proven at trial or in excess of $500,000.00.

While the Complaint focused on eleven motorcycles, Plaintiff's post-trial submissions only focused on six motorcycles, to wit: an original paint blue 1953 Indian Chief, an original paint red 1952 Indian Chief, an original paint black 1951 Indian Chief, two original paint blue 1947 Indian Chiefs, and a rust colored 1941 Four-cylinder Indian Basket Case.

### *Verified Answer and Counterclaims to Amended Summons*

Defendant Henke's Verified Answer asserted four affirmative defenses and fifteen counterclaims.

Of the affirmative defenses, the first affirmative defense is failure to state a cause of action. The second affirmative defense is the lawsuit is frivolous and fallacious and therefore an abuse of process. The third affirmative defense is statute of limitations. The fourth affirmative defense is barred by the statute of frauds and more particularly General Obligations Law § 5-701.

The first counterclaim is for the fair and reasonable value of work and labor performed and goods and materials furnished in the detailing of the 1953 Indian Chief motorcycle, which Defendant Henke submitted a bill of $3,105.80 to Plaintiff who failed to pay.

The second counterclaim is for the fair and reasonable value of work and labor performed for traveling to Ohio and purchasing the parts that make up the "4-cylinder Indian Basketcase" motorcycle per Plaintiff's direction, which Defendant Henke submitted a bill of $5,400.00 to Plaintiff who failed to pay.

The third counterclaim is for the fair and reasonable value of work and labor performed and the goods and materials furnished in the detailing of the 1952 Indian Chief motorcycle, which Defendant Henke provided a bill of $3,545.87 to Plaintiff who failed to pay.

The fourth counterclaim is for the fair and reasonable value of work and labor performed and the goods and materials furnished in the detailing of the 1951 Indian Chief motorcycle, which Defendant Henke provided a bill of $3,708.62 to Plaintiff who failed to pay.

The fifth counterclaim is for the fair and reasonable value of work and labor performed on the 1947 Indian Chief motorcycle from Tarrytown, New York for purposes of "breaking down" said motorcycle for inspection and evaluation as to the prospect for future restoration, which Defendant Henke provided a bill of $460.00 to Plaintiff who failed to pay.

The sixth counterclaim is for the fair and reasonable value of work and labor performed on the 1947 Indian Chief motorcycle from Oley, Pennsylvania for purposes of "breaking down" said motorcycle for inspection and evaluation as to the prospect for future restoration, which Defendant Henke provided a bill of $485.00 to Plaintiff who failed to pay.

The seventh counterclaim is for fraud, asserting that Plaintiff's claim for the 1936 Harley Davidson WR motorcycle which he allegedly paid $20,00.00 to Defendant Henke for is false, fraudulent, and a deceitful misrepresentation because such motorcycle was not produced until 1941. Defendant Henke "demands punitive damages in the amount of $250,000.00."

The eighth counterclaim is for fraud, asserting that Plaintiff's claim for the 1937 Harley Davidson WL motorcycle for $20,000.00 is false, fraudulent, and a deceitful misrepresentation to this Court and in an effort to obtain monetary gain. Defendant Henke "demands punitive damages in the amount of $250,000.00."

The ninth counterclaim is for fraud, asserting that Plaintiff's claim for the 1937 Knucklehead motorcycle which was delivered to Defendant Henke is false, fraudulent, and a deceitful misrepresentation to this Court and in an effort to obtain monetary gain. Defendant Henke "demands punitive damages in the amount of $250,000.00."

The tenth counterclaim is for fraud, asserting that Plaintiff's claim for the 1939 World's Fair Indian Chief motorcycle which he allegedly paid $75,000.00 to Defendant Henke for is false, fraudulent, and a deceitful misrepresentation to this Court and in an effort to obtain monetary gain. Defendant Henke "demands punitive damages in the amount of $250,000.00."

The eleventh counterclaim is for fraud, asserting that Plaintiff's claim for the 1948 Harley Davidson Pan Head motorcycle which he allegedly paid $35,000.00 to Defendant Henke for is false, fraudulent, and a deceitful misrepresentation to this Court and in an effort to obtain monetary gain. Defendant Henke "demands punitive damages in the amount of $250,000.00."

The twelfth counterclaim is for fraud, asserting that Plaintiff's claim for the 1951 Indian Chief motorcycle which he allegedly delivered to Defendant Henke is false, fraudulent, and a deceitful misrepresentation to this Court and in an effort to obtain monetary gain. The grounds for holding possession are that Plaintiff has not paid for the work and labor performed on said motorcycle. Defendant Henke "demands punitive damages in the amount of $250,000.00."

The thirteenth counterclaim is for fraud, asserting that Plaintiff's claim for the 1952 Indian Chief motorcycle which he allegedly delivered to Defendant Henke is false, fraudulent, and a deceitful misrepresentation to this Court and in an effort to obtain monetary gain. The grounds for holding possession are that Plaintiff has not paid for the work and labor performed on said motorcycle. Defendant Henke "demands punitive damages in the amount of $250,000.00."

The fourteenth counterclaim is for fraud, asserting that Plaintiff's claim for the 1953 Indian Chief motorcycle which he allegedly delivered to Defendant Henke is false, fraudulent, and a deceitful misrepresentation to this Court and in an effort to obtain monetary gain. The grounds for holding possession are that Plaintiff has not paid for the work and labor performed on said motorcycle. Defendant Henke "demands punitive damages in the amount of $250,000.00."

The fifteenth counterclaim is for fraud, asserting that Plaintiff's claim for the 1958 Harley Davison Pan Head motorcycle which he allegedly delivered to Defendant Henke is false, fraudulent, and a deceitful misrepresentation to this Court and in an effort to obtain monetary gain. Defendant Henke "demands punitive damages in the amount of $250,000.00."

Defendant Henke's post-trial submission requests, *inter alia*, that he be awarded $16,715.29 for his unpaid invoices and, upon payment of said amount, he be ordered to return Plaintiff's six motorcycles presently held by Defendant Henke. Further, Defendant Henke requests the Court find Plaintiff did not prove by a preponderance of evidence that he made any payments to Defendant Henke in cash, including the $84,500.00 for the delivery of the "bulk purchase" of parts.

### *Factual Background and Trial Testimony*

The Court heard testimony from several witnesses. Objections were noted and given the appropriate weight the Court deems just and proper. Subject to the objections, all of the witnesses' testimony was reviewed and considered in the rendering of this Decision. The Court highlights relevant aspects below per each witness' testimony.

*Trial Testimony of Allen Veverka*

Plaintiff's first witness was Defendant Veverka. The Court finds his testimony scattered, inconsistent, and generally lacking credibility. Responses were repeatedly changed, sometimes even in the same line of questioning (*i.e.*, he testified he called Plaintiff to sell the 1952 motorcycle, but a page later testified to Plaintiff calling him). His demeanor on the stand was guarded and hesitant at times. The Court observed a negative change in demeanor when the questioning proceeded from basic background to ultimate issues, particularly on questions where Defendant Veverka gave inconsistent answers. There were also times where he contradicted his sworn and signed deposition testimony.

Defendant Veverka testified he owned Rip's Storage, where some of the subject motorcycles are being held. He is an avid antique motorcycle collector. He defined a "basket case" as a motorcycle that does not run and is taken apart into many pieces.

The first time he heard of Plaintiff was when Plaintiff bought a 1953 Indian Chief motorcycle from James "Jim" Babchak. Defendant Veverka testified he was looking to purchase the same motorcycle when Plaintiff bought it first. Plaintiff and Defendant Veverka only met outside of litigation twice; once in Rhinebeck, New York in 2007, and once in 2008 or 2009.

Defendant Veverka testified he knows James "Jim" Reich, the owner of Top Dead Center, motorcycle repair company in Tarrytown, New York. Defendant Veverka testified he had been to that business three times, and Mr. Reich told Defendant Veverka that he worked for Plaintiff. The first time Defendant Veverka went there was when Plaintiff invited him to look at his motorcycle collection. The second time was to look at the new museum being built at the firehouse Plaintiff had just acquired. He went a third time to just stop by to see the repair shop. Each time he met with Mr. Reich.

Defendant Veverka testified he agreed to sell three motorcycles to Plaintiff, including a red 1952 Indian Chief motorcycle, a 1939 Indian Chief, and a 1947 black Indian Chief. The last motorcycle was delivered to Defendant Henke on Plaintiff's behalf.

Defendant Veverka testified at trial it was not customary to buy and sell motorcycles with cash. He testified to not performing a single transaction in cash with Plaintiff, and not receiving any payments for motorcycles from Mr. Reich on Plaintiff's behalf. This was in contravene to his signed deposition testimony, where Defendant Veverka testified that it *was* customary to buy and

sell motorcycles with cash.  He testified that Defendant Henke did not act as a liaison or broker for any of his motorcycle sales.

Defendant Veverka testified he sold the red 1952 Indian Chief to Plaintiff for $25,000, which was paid for in three checks received in the mail.  There is no contract of sale.  He believed the sale occurred during the summer of 2008.  However, his supplemental interrogatory response was for $28,000 and in 2003.  He then testified that he sold this motorcycle to Plaintiff after they met, which the first meeting was in Rhinebeck during the spring of 2007.  This contradicted his prior deposition testimony which specifically stated the motorcycle was sold "[b]efore the Rhinebeck meet.  That happened before the Rhinebeck meet."  Defendant Veverka also testified to calling Plaintiff and informing he was selling the motorcycle, Plaintiff saying he would send him payments, and believing Plaintiff saw photographs of the motorcycle on the internet even though he never put it on the internet to sell.  A few questions later, he testified that Plaintiff called him.  The motorcycle was picked up by Defendant Henke at Plaintiff's direction.

### Trial Testimony of Daniel Henke

Plaintiff's second witness was Defendant Daniel Henke.  The Court finds Defendant Henke's testimony inconsistent, incognizant, and not credible.  While Defendant Henke's testimony was found to be knowledgeable about motorcycles, he wavered as to the facts—even basic facts.  He gave responses completely opposite to his deposition testimony.  His body language on the stand was nervous, particularly when asked pointed questions about ultimate issues.  Other times he was aggressive, loud, disagreeable, and disapproving of some of the questions.  His answers, while confident about background information or specific questions about motorcycles in general, were noticeably less-confident about key issues.  This was particularly evident when the Court was questioning Defendant Henke regarding why he kept picking up and agreeing to restore motorcycles at Plaintiff's "express request," but still contended that he did not know if Plaintiff actually owned the motorcycles; why would Plaintiff pay him restore motorcycles that were not his?  Defendant Henke also testified that he would only leave an invoice with the "owner," but if Plaintiff was not there, Defendant Henke would mail the invoice to Mr. Reich at Top Dead Center.  This of course acknowledged Plaintiff was the owner, and further that he did not "only" leave the invoice with the owner because he mailed it to Mr. Reich, not the owner, when he knew Plaintiff's mailing address.  Defendant Henke would frequently claim that his dealings with Plaintiff were on "good faith" and due to a "long standing" relationship, but it was

evident he was just throwing around terms without meaning. For example, he testified he did not have Plaintiff sign the proposals due to the trust and long standing relationship, but even the first motorcycle—the first time they met—he did not have Plaintiff sign the proposal. At times, Defendant Henke's frustration would come through his testimony which further marred his credibility.

Defendant Henke testified he operates Henke Cycle which restores antique motorcycles since 1983. He testified his first contact with Plaintiff was via a telephone call Plaintiff initiated. He believes the first time he met Plaintiff was in May of 2007, and in total four or five times.

Defendant Henke testified to knowing Mr. Babchak, and that Mr. Babchak was selling a motorcycle to Plaintiff. He believes this occurred in early 2003, when he was summoned to Mr. Babchak's to pick up Plaintiff's motorcycle for a total restoration. He defined a total restoration as breaking something down to its bare necessities.

Defendant Henke testified that in June of 2007 and August of 2007 he went to Top Dead Center and delivered portions of a bulk antique parts purchase to Plaintiff. He testified Mr. Reich was there both times, but he was not present when the parts were offloaded; only Plaintiff and himself were there. He testified Mr. Reich did not leave Top Dead Center during the deliveries, which took place at the museum just offsite and around the corner.

Defendant Henke testified that he has possession of the red 1952 Indian Chief sold to Plaintiff by Defendant Veverka. He took possession in 2008 at Plaintiff's express request that he evaluate it to determine what restoration was going to be completed. He testified that he introduced Plaintiff and Defendant Veverka at a motorcycle meet.

In total, Defendant Henke testified that he has possession of six motorcycles involved in the litigation. All are in Rip's Storage and he has the key to the storage unit. Despite testifying he did not know if Plaintiff owned any of the motorcycles, Defendant Henke testified he was "pretty certain" at least five belonged to Plaintiff. He claims the sixth has not been fully paid for, which is the 1947 Indian Chief that he picked up for Plaintiff at the Oley, Pennsylvania meet in 2007. He testified that he does not know how much that was for, and only that he was "entrusted" to transport it along with another motorcycle for Tony Watson of Rocky's Antique Parts. Defendant Henke testified that 1947 motorcycle is completely disassembled and in a storage unit at Rip's Storage.

Later, Defendant Henke testified he does not know who any of the motorcycles in question belonged to, because he claims Plaintiff did not present proof of ownership. He was questioned on this by Plaintiff's counsel and the Court. As to the 1953 Indian Chief, Defendant Henke testified that, as far as he knows, it belongs to Plaintiff.

For the 1947 Indian Chief he picked up in Oley, PA, he claims that Mr. Watson advised him to hold the motorcycle until payment cleared. One other motorcycle picked up in Oley did clear, but Defendant Henke claims he never received notification from Mr. Watson that the 1947 motorcycle was paid for by Plaintiff.

As for the 1951 Indian Chief, Defendant Henke testified that was from Mr. Greene in North Carolina and shipped directly to him at the request of Plaintiff. He claims that he received a bill laden on it from the shipping company, and believes Plaintiff paid for it.

For the other 1947 Indian Chief purchased from eBay Canada which he picked up in Tarrytown, New York at the request of Plaintiff. Defendant Henke claims he has never received proof that Plaintiff owns that motorcycle. Defendant Henke claims he was just asked by Plaintiff to pick up the motorcycle in Tarrytown and do a restoration on it, but doesn't know that it is Plaintiff's motorcycle.

As for the 1941 Indian Chief, Defendant Henke testified he picked it up on his return trip from Ohio. It came from Rocky's Antique parts as part of a massive bulk part purchase that he supervised at the "express request" of Plaintiff, Rocky Halter, and Mr. Watson. He testified that he was told that Plaintiff paid for the motorcycle and believes Plaintiff owns it. However, Defendant Henke testified that Plaintiff agreed he would pay him for his expenditures and time in picking up the motorcycle but Plaintiff never did.

As for the 1952 Indian Chief, Defendant Henke testified that this is the motorcycle from Defendant Veverka that Plaintiff had him go pick up. Defendant Henke testified that he had "no idea" Plaintiff even purchased it from Defendant Veverka, but in the very next sentence testified "I got a call from [Plainitff] that [he] purchased a motorcycle from your buddy [Defendant Veverka], per se, and to go ahead and grab it and start work process on it."

Defendant Henke also testified as to the labor he performed for the motorcycles. He noted that the common practice between him and Plaintiff was to get an evaluation of each motorcycle and for Defendant Henke to report back. Defendant Henke testified he was a proponent of the method to keep the original paint, whereas Plaintiff was a "massive proponent to total restoration"

and wanted to tear the motorcycles apart to rebuild and wanted to get started. Defendant Henke testified that John Pierce gave evaluations of the paint work for a number of Plaintiff's motorcycles, but only worked on the black 1947 motorcycle.

Regarding labor for the black 1947 Indian Chief purchased from Defendant Veverka,[2] Defendant Henke claims he did "major detailing" and it was the largest job he ever did for Plaintiff. He received a $5,000 deposit from Plaintiff on February 8, 2011 for the detailing work and sent a confirmation receipt. Once he completed the work, Defendant Henke testified he went to deliver the invoice but Plaintiff was not present. Since he does not "leave any paperwork other than with the owner[,]" Defendant Henke instead sent the invoice to Mr. Reich at Top Dead Center. Plaintiff paid within a couple of weeks of $7,433.94. The amount is marked "paid in full."

For other motorcycles, Defendant Henke testified to delivering his finished product to Top Dead Center, Plaintiff was not present, leaving the invoice, and Plaintiff would pay approximately three weeks later in full. This occurred several times.

But for the 1953 Indian Chief, Defendant Henke claims that Plaintiff requested he store the motorcycle with his storage unit on account of the construction job occurring at his museum to house the motorcycles. Defendant Henke confirmed that Plaintiff requested return of his motorcycles in 2012, but claims there was an agreement that Plaintiff would pay the storage fees and old invoices "and [Plaintiff] would start the process after the delivery of" the 1947 and 1939 Indian Chief motorcycles. Plaintiff allegedly wanted both motorcycles at the same time.

Defendant Henke testified that the 1947 motorcycle was paid for, but Defendant Veverka allegedly stopped Defendant Henke from picking up the 1939 motorcycle. Defendant Henke did not process both motorcycles because of that. Defendant Henke claims he called Plaintiff over the 1939 motorcycle which started an argument. Defendant Henke testified that Plaintiff never told him that he paid the invoice or that he paid Defendant Veverka for the 1939 motorcycle.

As for the labor to the 1953 Indian Chief from Mr. Babchak, Defendant Henke testified that the written evaluation on the motorcycle was "probably not" sent to Plaintiff. When asked if Defendant Henke ever had Plaintiff sign the work proposals, Defendant Henke testified "[n]o, because as we've long established, we had a long work relationship and interaction for almost

---

[2] While in the amended Complaint, not one of the six motorcycles sought by Plaintiff in the post-trial papers. Defendant Henke still has a counterclaim for labor performed on this motorcycle even though he testified it was "paid in full."

fifteen years." When reminded that the 1953 motorcycle was the first motorcycle between Defendant Henke and Plaintiff, hence there was no long standing relationship at the time of this transaction, Defendant Henke became noticeably dumbfounded and responded no, he did not have Plaintiff sign that work proposal or receive any written authorization. Defendant Henke claims that Plaintiff still owes $3,115.80 for the 1953 motorcycle.

Defendant Henke was questioned regarding why he was not contacting Plaintiff for the owed invoices like a bill collector and why he stopped accepting Plaintiff's phone calls. Initially, he testified "[t]hat is not true[,]" but that was inconsistent with his deposition testimony. Defendant Henke was asked if Plaintiff requested to have his motorcycles back in 2012 and if Defendant Henke stopped taking Plaintiff's phone calls, and Defendant Henke replied "[a]bsolutely." At that time Defendant Henke had all six motorcycles in his possession.

As to the propriety of work, Defendant Henke's invoice for the 1953 motorcycle sought $600 for the rust and sludge removal and cleaning of the gas cap and the time of the gas tank. Defendant Henke testified he completed said work. However, the photographs of the gas cap and gas tank rim were laden with rust and sludge. When asked if the gas cap and gas tank rim were clean, Defendant Henke said no. When asked if free of rust and sludge, he said no. When asked why his invoice claimed he cleaned it but the photographs depicted otherwise, Defendant Henke testified that he cleaned and serviced the machine, had it running and drivable, and then stored it at Plaintiff's "express request." This was stored "wet" and Plaintiff never came to pick it up for more than two years, which caused the rust and sludge.

Defendant Henke was then reminded that Plaintiff wanted the motorcycles to be museum ready and not for road use or in running condition. Defendant Henke got agitated and frustrated, and replied motorcycle so he proceeded like any other customer. However, this was in direct contradiction with his deposition testimony where he testified that Plaintiff's direct instructions were to not have the motorcycles for road use. Turning to the "proposal," which was Defendant Henke's billhead, in Defendant Henke's handwriting it provides "I decided this in spite of your clear indication of having no desire what so ever operating these particular motorcycles over the highway, their sole purpose slated for exhibitory purposes within your private museum." Defendant Henke confirmed that statement was accurate. Defendant Henke's demeanor was very hesitant, even agitated, and distinctly lacking credibility.

Regarding the labor for the red 1952 Indian Chief, John Pierce came to Defendant Henke's shop, performed an evaluation, and gave an estimate of $1,979.75 for the paint restoration. Defendant Henke testified that Mr. Pierce was a "high end professional restorer" of antique motorcycles. Defendant Henke then did the paint restoration and charged that price under "strict supervision" of Mr. Pierce. However, Mr. Pierce lived in New Hampshire with his shop, and Defendant Henke's shop is in Cairo, New York; Mr. Pierce never came back after the evaluation.

There were claims for parts as well. Defendant Henke testified that the generator was required to operate the motorcycle, as was the carburetor. When asked why he replaced each of those parts when the motorcycle was not to be for road use, he became agitated and hesitant, and claimed it was to prevent corrosive issues.

As for repairs, Defendant Henke billed Plaintiff $1,923.31 for repair to the fender, and $240 for repair of rust damage to the battery area. When asked to review certain photographs in evidence, all still depicting rust and paint damage, Defendant Henke testified it was a "damp, cold storage building" where he stored the motorcycles which is what caused the rust. As for $720 worth of wiring, the photographs depict wires still frayed and visible. Defendant Henke testified that was all added, including that he "added frayed wire" and "[d]eteriorated patina wire" to the motorcycle. Later, when asked by the Court if the storage building was climate controlled, Defendant Henke testified "[i]t's a cold, dry storage[.]" Defendant Henke testified that there were no photographs of the work after he completed them, no evidence of confirming the work telephonically, and no specific parts lists given to Plaintiff.

Regarding the 1951 Indian Chief, Defendant Henke's invoice noted he was removing rust issues throughout the inside and outside of the motorcycle. Photographs after his work depict continued rust on the motorcycle, including on the gas cap and inside the gas tank. Defendant Henke testified it was "[m]ild surface rust[,]" and a little oxidation.

Defendant Henke testified that Plaintiff threatened him to have his motorcycles returned to him. When asked if Plaintiff said he was not going to pay Defendant Henke's invoices, Defendant Henke testified Plaintiff "said just get my equipment down here or I'm coming after you." When asked why Defendant Henke did not just drop off the motorcycles and get paid within 30 days like on the other occasions, Defendant Henke said that he just did not drop off any of those motorcycles. When pointedly asked didn't he deliver the 1947 motorcycle previously which had an outstanding $7,400 invoice, Defendant Henke stated he was paid in full for that. However, he was paid in full

three weeks later. When again asked why he did not drop off the motorcycles which had a smaller bill of $3,000—which Defendant Henke labeled as a "light job"—Defendant Henke referenced the argument between Plaintiff and Defendant Veverka over the 1939 motorcycle as the reason. Defendant Henke admitted that Plaintiff had never refused to pay him prior to 2012 when this argument occurred.

Regarding the 1947 Indian Chief from Oley, Defendant Henke testified Plaintiff wanted it completely restored and he disassembled it, even though it was an original paint motorcycle. Defendant Henke had nothing written proving this. The 1947 Indian Chief from Canada (Tarrytown motorcycle), Defendant Henke also disassembled the motorcycle. Defendant Henke also has no written document permitting this motorcycle from being disassembled.

There were two bulk purchases; one was a basket case in Ohio, and another allegedly from Mark Haines. As for the 1941 four-cylinder Indian basket case, Defendant Henke testified he brought it back from Ohio and had done no work on it. Defendant Henke testified that the reason why he did not deliver the motorcycle to Plaintiff despite him requesting it is "because we got into an argument in 2012, and that ended it." Defendant Henke claims that Plaintiff orally agreed to pay him $5,400 for the labor and travel time. Defendant Henke was paid a commission of $12,000 for this deal from the Ohio sellers.

Defendant Henke also testified about the bulk parts purchase from Mr. Haines, which he believed was several thousand dollars' worth of parts he delivered to Plaintiff in early June of 2007 and then in August of 2007. The first shipment was delivered before the first payment was received. Defendant Henke claimed the parts were delivered to 17 North Washington, just around the block from the Set Back Inn where he met with Plaintiff and one of Plaintiff's associates from the medical field for a meal. This was around the corner from Top Dead Center. Defendant Henke was paid a commission for the sale. Defendant Henke used $50,000 from Plaintiff to pay the seller, Mr. Haines. Defendant Henke turned around and sold the parts to Plaintiff for $84,500. Defendant Henke claimed that Plaintiff wanted the antique inventory of memorabilia parts, motorcycles, collections, and related.

Defendant Henke testified to never meeting Plaintiff in the parking lot of the Eldorado Diner in 2006. He never received any money from Mr. Reich. Defendant Henke believes this is an insane claim and just a "personal vendetta" against him. Defendant Henke testified there has been no written request by Plaintiff for return of his motorcycles, and Plaintiff has not expressed

any dissatisfaction with the work he performed on the motorcycles. However, Defendant Henke also testified that Plaintiff had not seen the work Defendant Henke performed on the 1951, 1952, and 1953 motorcycles after Defendant Henke's alleged work.

### Trial Testimony of Janet Reich

Plaintiff's third witness was Janet Reich. The Court finds her testimony credible, but limited in personal knowledge of the occurrences between the parties.

Mrs. Reich testified she met Defendant Henke once at her house in 2007. The occurrence was when Defendant Henke came to pick up money from Mr. Reich. She observed an envelope of the money, and beforehand Mr. Reich showed her the stack of money in it. Her impression was "wow, that's a lot of money." It was her understanding that it was $30,000. She witnessed her husband, Mr. Reich, hand the envelope of money to Defendant Henke.

On cross-examination, she testified that she did not know how much money was in the stack, she did not count the money, but the stack was approximately one or two inches thick. She is absolutely positive the money was for Defendant Henke as her husband said his name, and she recognized him at trial. She testified Mr. Reich told her the money was for a motorcycle for Plaintiff.

Mrs. Reich testified to knowing Plaintiff and that Mr. Reich would get paid by Plaintiff to work for him. She has known Plaintiff for a "pretty long time."

### Trial Testimony of James Reich

Plaintiff's fourth witness was James Reich. The Court finds his testimony credible and sincere, and the most credible of all witnesses presented at trial.

Mr. Reich testified to being the owner of Top Dead Center, a motorcycle shop which sells parts and completes repairs or service on motorcycles. He met Plaintiff in 1994, and performs work for Plaintiff's motorcycles.

Mr. Reich testified he knows Defendant Veverka from when he would come to Top Dead Center to pick up money from Plaintiff. Mr. Reich testified he knows Defendant Henke, who would also come to Top Dead Center to pick up cash from Plaintiff. Specifically, he recalls Defendant Henke coming in early 2007 to pick up $30,000 from Plaintiff in fifties and hundreds. Mr. Reich testified he remembers Defendant Henke going to Oley in April of 2007 because Defendant Henke delivered a motorcycle to Top Dead Center after the trip. Mr. Reich testified he remembered Defendant Henke coming down two other times to pick up cash from Plaintiff; he

could not remember for what motorcycles or how much, but each time it was between $25,000 and $30,000.

Mr. Reich testified he had an opportunity to inspect the 1951, 1952, and 1953 motorcycles in storage which Defendant Henke claims that he performed work on as indicated on the invoices. He testified that it appeared no work had been performed on any of the motorcycles. When asked if he believed that the work, if performed five to eight years prior, would have resulted in a buildup of rust from being in the storage unit as seen during his inspection, Mr. Reich testified "I don't think so, and I say that only because I have done this for many, many years, and I would say no." He admitted that they may be some occurrence of rust and corrosion, but he saw no signs of any work being performed on the motorcycles.

Mr. Reich testified he usually counted the money in the envelopes, but does not remember which times. He remembers Defendant Henke picking up cash at Top Dead Center at least three times. He believes Plaintiff and Defendant Henke went to Eldorado diner to look at tins, or parts of the motorcycle such as the gas tanks and fenders; these were in the back of Defendant Henke's vehicle wrapped in a blanket.

Regarding the bulk parts, Mr. Reich testified that Defendant Henke "never" showed up at Top Dead Center to deliver two shipments of parts. He has never seen the bulk parts in Plaintiff's motorcycle building around the corner from the shop. As for the motorcycle repairs, Mr. Reich testified he did not see the motorcycles prior to Defendant Henke's alleged repairs to compare them with the condition after the alleged repairs.

### Trial Testimony of Diana Henke

Plaintiff's fifth witness was Diane Henke. The Court found her testimony guarded, visibly nervous, not credible, and limited as to the transactions between the parties.

Mrs. Henke testified that she had no involvement with the motorcycle repair shop owned by her husband, Defendant Henke. She has never done any bookkeeping, proposal writing, or invoice writing. She knows of Plaintiff and met him a couple of times. She did not remember if Plaintiff attempted to call her on her cell phone in 2012, but testified he "probably" may have. It was her understanding from her husband that Plaintiff was a disgruntled customer, but she did not know why. She claims she was not aware of the business between Plaintiff and Defendant Henke. She claims that Defendant Henke would not tell her anything about the business.

Mrs. Henke claims that she has never been to Top Dead Center, even though Defendant Henke testified she went with him once. She testified she never received or saw Defendant Henke receive any cash for the work that he has done. She knows of Mark Haines, but was not aware of Defendant Henke purchasing any parts from Mr. Haines.

Mrs. Henke testified that the repair shop is located at the back of where they reside, but up a hill and out of sight. She is not aware of Defendant Henke's finances, but admits to filing tax returns jointly the last few years and being aware of "some finances[.]"

### Trial Testimony of Dominick Cannavo, M.D.

Plaintiff's sixth witness was himself, Dominick Cannavo, M.D. The Court finds his testimony mostly credible, but some remarks were incredulous. His testimony was clear and he was knowledgeable of the facts surrounding these transactions. When asked questions about the ultimate issues at trial, his demeanor remained calm and credible. Plaintiff was very specific as to the facts and circumstances involving the sales of the motorcycles, including particular details demonstrating an aurora of truthfulness. For instance, Plaintiff testified he remembers Defendant Henke calling him on a Saturday morning when he was sleeping regarding the 1947 Indian Chief in Oley, PA, or that it was a Friday afternoon and he was on the southeast corner of 86th and Lexington when Mr. Watson called about the basket case. Plaintiff's testimony, while he would go on tangents at times, was much clearer and specific as compared to the vaguer assertions by each Defendant.

Plaintiff testified he started collecting vintage motorcycles in 1994 when he met Mr. Reich. At the time of trial, he testified to owning approximately 120 motorcycles, including a BMW he personally rode. Plaintiff testified that he never intended to ride any of the antique motorcycles, and cited safety concerns with anti-lock brakes. He came across the 1953 Indian Chief owned by Mr. Babchak, contacted Mr. Reich, and purchased the motorcycle in 2002. Mr. Babchak referred Plaintiff to Defendant Henke to complete repairs of the motorcycle. Defendant Henke picked up the motorcycle from Mr. Babchak and brought it back to his shop. Plaintiff testified he "never" saw Defendant Henke's invoice for the work completed on this motorcycle before the litigation was commenced.

Plaintiff testified he also purchased a 1951 Indian Chief from Michael Greene. He spoke with Defendant Henke and had the motorcycle delivered to Defendant Henke's shop for an evaluation. Plaintiff testified "[w]e never agreed on any work[,]" and since it was an original paint motorcycle, he would not have agreed to any work on it. Plaintiff wanted "[j]ust an evaluation" on the motorcycle. Plaintiff testified he never saw the invoice for this motorcycle prior to the litigation.

Regarding the 1947 Indian Chief from the Oley, PA meet, Plaintiff testified Defendant Henke called him while he was sleeping. Defendant Henke stated the price was $28,000, the motorcycle was in good condition, and it was an original paint. Plaintiff agreed to purchase the motorcycle and paid Defendant Henke $28,000 in cash. Plaintiff testified he gave the money to Mr. Reich out of consideration for Defendant Henke, so Defendant Henke did not have to travel down to the city in his van. Plaintiff testified he left the $28,000 in cash with Mr. Reich who gave Defendant Henke the envelope of money. Defendant Henke brought the motorcycle back to his shop, but Plaintiff did not authorize him to completely disassemble the motorcycle. Plaintiff averred he never saw the invoice for the work to this motorcycle before the litigation commenced. He also did not have any contact or communication with Mr. Watson; the only discussions to purchase the motorcycle were through Defendant Henke.

Regarding the 1947 Indian Chief on eBay from Canada, Plaintiff testified that he purchased the motorcycle online and saw it at Mr. Reich's motorcycle shop before Defendant Henke went to pick it up. He claims it was "perfect" and an original paint. Plaintiff testified he never authorized Defendant Henke to completely disassemble it, and only that there were some corrosion issues with the fuel tank.

Regarding the 1941 four-cylinder Indian Chief basket case, Plaintiff remembers exactly where he was when Mr. Watson called him seeking to sell it for $45,000. Plaintiff testified he paid Mr. Watson directly, and authorized Defendant Henke to pick up the motorcycle in Ohio. Plaintiff just wanted Defendant Henke to deliver that motorcycle without performing any work on it, but Defendant Henke refused to deliver it to Plaintiff after picking it up.

Regarding the 1952 Indian Chief Plaintiff purchased from Defendant Veverke, Plaintiff testified he originally found it online from Jerry Grear who sold it to Defendant Veverke. Plaintiff contacted Defendant Henke telling him that he was interested in that motorcycle. Years later, Defendant Henke notified Plaintiff that Defendant Verveke was "willing" to sell that motorcycle

to Plaintiff for $35,000. Plaintiff agreed because it was an original paint motorcycle. Plaintiff testified he paid Defendant Veverka directly. Defendant Henke ended up with the motorcycle and Plaintiff testified he is not sure "how he wound up with it." Plaintiff never received a copy of the evaluation or the invoice Defendant Henke performed on the motorcycle prior to commencement. Plaintiff testified that he "[n]ever" authorized Defendant Henke to perform any work on the 1952 Indian Chief. Plaintiff testified that he never told Defendant Henke to "hold until further notice" the 1952 Indian Chief.

Plaintiff testified that all six motorcycles in question are at Rip's Storage and Defendant Henke has the key. Plaintiff testified he requested the motorcycles back in an e-mail and numerous times on the telephone, and Defendant Henke has stopped accepting his telephone calls.

Regarding the 1947 Indian Chief Plaintiff acquired from Defendant Veverka for $30,000, he paid Defendant Henke a $5,000 deposit to work on the motorcycle. Plaintiff received the invoice when the work was complete. Defendant Henke delivered the motorcycle once complete and the invoice for the remaining balance, which Plaintiff paid. This was the only invoice Plaintiff ever received from Defendant Henke prior to the commencement of litigation.

Regarding the bulk parts purchase, Plaintiff testified he purchased the parts from Rocky's in Ohio after receiving a call from Defendant Henke. Plaintiff then spoke with Mr. Watson and Rocky directly to purchase the bulk parts, and paid them $191,500 in two installments for the parts. Plaintiff testified he never agreed to pay Defendant Henke for picking up the bulk parts, and never agreed to pay him $5,400 for this deal. Plaintiff testified he never received the invoice before the litigation was commenced.

Plaintiff confirmed he heard Defendant Henke's testimony that Plaintiff allegedly paid a total of $84,500 for a bulk parts inventory Defendant Henke received from Mark Haines. Plaintiff avers he never received any of the bulk parts. He never received half of the shipment from Defendant Henke at the firehouse museum like Defendant Henke testified. He did not help offload parts into any warehouse. Plaintiff never received the inventory list from Defendant Henke prior to commencement of litigation, and never saw any of those parts.

Plaintiff testified that he believed the $84,500 he paid Defendant Henke was for Defendant Veverka's 1937 Knucklehead that Defendant Henke was brokering. These checks were sent in installments from June 2007 through September 2007. Defendant Veverka asked for $10,000 for a final payment for the motorcycle, and Plaintiff issued him a check on January 26, 2011 for the

final payment which had "1937 Knucklehead" written on it. Plaintiff testified he never received any parts, his money back, or the 1937 Knucklehead.

Plaintiff testified Defendant Henke met with him in spring of 2006 with motorcycle parts wrapped in a blanket at the Eldorado Diner. Plaintiff claims he paid Defendant Henke $5,000 in cash for the parts and then went to Mr. Reich's motorcycle shop with the parts.

Regarding the "loggerheads" incident, Plaintiff testified that he saw Defendant Veverka's 1939 World's Fair Indian Chief at a motorcycle meet. Plaintiff testified this was in blue and orange, World's Fair colors. Thereafter, Defendant Henke called him noting Defendant Veverka was interested in selling it, and Plaintiff agreed to pay $75,000 for the motorcycle. Plaintiff wired $65,000 to Defendant Veverka directly and paid the remaining $10,000 to Defendant Henke with his wife present at the rest stop on the thruway.

In 2011, Defendant Henke delivered the 1947 Indian Chief, purchased separately, and not the 1939 World's Fair motorcycle. Plaintiff wanted the 1939 motorcycle and claimed that it did not need any work, he just wanted it. Plaintiff testified that Defendant Henke refused, claiming that he was waiting for a "wiring harness" and for Mr. Watson to approve. Plaintiff claimed they never discussed a wiring harness and wanted the motorcycle which was fully paid for. Defendant Henke again refused to deliver it, and Plaintiff believed he was making excuses. After the litigation was commenced, Plaintiff saw the motorcycle for the first time and it was actually a red motorcycle—not the blue and orange World's Fair one. In 2012, Defendant Henke stopped accepting Plaintiff's telephone calls which precipitated this litigation.

Defendant Henke's first witness was Plaintiff, Dominick Cannavo. He testified the only cash he witnessed Defendant Henke accept is the $10,000 in front of Mrs. Henke on the thruway. That money was for the balance of the World's Fair motorcycle. Plaintiff testified he did not have any contact with Defendant Veverka over the sale of the motorcycle; all contact was through Defendant Henke. Plaintiff testified he never wanted a wiring harness for the 1939 motorcycle as he had no intent of riding the motorcycle.

*Trial Testimony of Daniel Henke (During Defendant's Case-in-Chief)*

Defendant Henke's second witness was himself, Defendant Henke. He testified to never meeting Plaintiff to accept the $10,000 with his wife. He also claims to never accepting any cash from Plaintiff for Defendant Veverka. Defendant Henke testified he never accepted any cash, and all payments were checks or wire transfers.

### *Discussion/Conclusions of Law*

Defendant Henke's post-trial submission argues that Plaintiff "was the kid who had his lunch stolen in the schoolyard[,]" and "now fancies himself as having 'revenge' on all those 'bullies'" who took his money with his New York lawyers. If that is the case, since *everyone* has New York lawyers, Defendant Henke and Defendant Veverke are indeed the bullies. The testimony evinced a material breakdown in 2012 between Plaintiff and Defendant Veverke over the sale of the 1939 World's Fair Indian Chief. This motorcycle sale was brokered by Defendant Henke. Prior to triggering event, known as the "loggerheads" event, there were no issues with Defendant Henke delivering unpaid products to Plaintiff. The testimony was consistent that Defendant Henke would complete the labor, deliver the product, and Plaintiff would pay several weeks thereafter. However, once this "loggerheads" event occurred, that was no longer the case— even for less-expensive invoices. The entire issue with Rip's Storage is also a farce, as it is owned by Defendant Veverke and used by Defendant Henke. There is no indication that Defendant Veverke sought or commenced an action against Defendant Henke for unpaid storage fees, which such claim(s) may even be barred by the statute of limitations. It is clear the two collaborated together to gouge the price of storage fees to pass on to Plaintiff, but there is no burden on either of them.

As the trier of fact, after due consideration and deliberation, the Court has made several credibility assessments and resolved several questions of fact. Accordingly, the Court sees this dispute as nothing more than two grammar school friends trying to take advantage of a rather naïve—as he admits in his testimony—deep-pocketed, out-of-town doctor.

### *Replevin and Conversion*

Plaintiff seeks return of the six motorcycles held in Defendant Henke's storage unit on the grounds of replevin and conversion. "A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession" (*Colavito v New York Organ Donor Network, Inc.*, 8 NY3d 43, 49-50 [2006], citing *State of New York v Seventh Regiment Fund*, 98 NY2d 249 [2002]; *accord East Schodack Fire Co. v Milkewicz*, 140 AD3d 1255 [3d Dept 2016]). "Two key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights" (*Colavito*, 8 NY2d at 50 [internal citations omitted]). "Some affirmative act—asportation by the

defendant or another person, denial of access to the rightful owner or assertion to the owner of a claim on goods, sale or other commercial exploitation of the goods by the defendant—has always been an element of conversion" (*Seventh Regiment Fund*, 98 NY2d at 260).

"[W]here possession of property is initially lawful, conversion occurs where there is a refusal to return the property upon demand" (*Salatino v Salatino*, 64 AD3d 923, 925 [3d Dept 2009]). "It is elementary that the law of conversion is concerned with possession, not with title" (*Pierpoint v Hoyt*, 260 NY 26, 29 [1932]).

Here, while Defendant Henke initially testified he was unsure whether Plaintiff actually owned the subject motorcycles, through the prying of his nonsensical testimony he admitted that he believed Plaintiff owned each of them. Defendant Henke testified no one else has made a claim for the motorcycles. Defendant Henke testified he has the six subject motorcycles in a storage locker and the key. While Defendant Henke lawfully had possession of the motorcycles, Plaintiff testified he made demands for the return of the motorcycles both via e-mail and over the telephone in 2012, which was corroborated by Mr. Reich. Defendant Henke has refused to deliver the six subject motorcycles. Defendant Henke has not established there are any grounds for retaining the motorcycles, including no assertion of a lien(s). Defendant Henke's affirmative defenses and legal and factual challenges to Plaintiff's proof were insufficient to warrant a different verdict.

Given these facts, it is a clear-cut case of conversion and Plaintiff is entitled to the immediate return of these six subject motorcycles: An original paint blue 1953 Indian Chief; an original paint red 1952 Indian Chief; an original paint black 1951 Indian Chief; two original paint blue 1947 Indian Chiefs; and a rust colored 1941 four-cylinder Indian basket case.

Therefore, Plaintiff's second and third cause of action are granted against Defendant Henke.

### *Unjust Enrichment*

Plaintiff contends that Defendant Henke was unjustly enriched in the amount of $164,500 that Plaintiff provided to Defendant Henke for the purchase of several motorcycles. "A cause of action for unjust enrichment arises when one party possesses money or obtains a benefit that in equity and good conscience they should not have obtained or possessed because it rightfully belongs to another" (*Mente v Wenzel*, 178 AD2d 705, 706 [3d Dept 1991], citing *Parsa v State*, 64 NY2d 143 [1984]). Therefore, "[a] plaintiff must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit [the other

party] to retain what is sought to be recovered" (*Marndarin Trading Ltd. v Wildenstein*, 16 NY3d 173, 182 [2011] [internal quotations and citations omitted]). "The essence of such a cause of action is that one party is in possession of money or property that rightly belongs to another" (*Clifford R. Gray, Inc. v LeChase Constr. Serv. LLC*, 31 AD3d 983, 987–88 [3d Dept 2006], citing *Paramount Film Distributing Corp v. State*, 30 NY2d 415 [1972], *cert denied* 414 US 829 [1973]).

First, Plaintiff claims he is entitled to the return of $84,500 that he paid Defendant Henke, acting as broker for Defendant Veverke, for the purchase of Defendant Veverke's 1937 Knucklehead motorcycle. Defendant Henke claims that this $84,500 was for the bulk parts he delivered in two shipments, not the 1937 motorcycle. After due deliberation and considering the testimony and documentary evidence, including the series of financial records with the last check noting "1937 Knucklehead," as the trier of fact, the Court finds Plaintiff's rendition more credible than Defendant Henke's. Plaintiff established he paid $84,500 to Defendant Henke and received nothing in return, and it would be against equity to allow Defendant Henke to retain such funds.

Second, Plaintiff claims that he is entitled to the return of $35,000 he paid to Defendant Henke in furtherance of the purchase of the 1936 and 1937 Harley Davidson motorcycles. Plaintiff contends he paid Defendant Henke $5,000 directly after seeing the tins wrapped in a blanket at the Eldorado Diner, and another $30,000 provided to Mr. Reich to give to Defendant Henke for the two motorcycles and the tins. Defendant Henke claims that he never sold Plaintiff a Harley Davison motorcycle or showed him any tins at the Eldorado Diner. After due deliberation and considering the testimony, as the trier of fact, the Court finds Plaintiff's rendition more credible than both Defendant Henke. Plaintiff was very specific as to the details of the transaction at the Eldorado Diner, including the manner in which the tins were wrapped, where Plaintiff was when Defendant Henke called to initiate the transaction, and how the transaction occurred. The Court also found Mr. Reich's testimony to be the most credible of any witness, which he testified to paying $30,000 to Defendant Henke in his living room. This was corroborated by Mrs. Reich, who witnessed Defendant Henke pick up the cash in an envelope from her husband. Plaintiff testified he never received either motorcycle or the tins after providing this money to Defendant Henke, and it would be unjust to allow Defendant Henke to retain such funds. Therefore, Plaintiff has proven entitlement to the return of his $35,000.

Third, Plaintiff claims he is entitled to the return of $10,000 given to Defendant Henke, acting as broker for Defendant Veverka, for the purchase of Defendant Veverka's 1939 Indian Chief motorcycle. Plaintiff contends he paid this in cash to Defendant Henke with his wife at a rest stop on the thruway. Defendant Henke and his wife testified that transaction never occurred, and Defendant Henke testified that he "never" accepted any cash for motorcycle transactions with Plaintiff. After due deliberation and considering the testimony, as the trier of fact, the Court finds Plaintiff's rendition more credible than both Defendant Henke and Mrs. Henke. The fact that Defendant Henke testified to "never" accepting any cash for any of these motorcycles was greatly skewered by the highly credible testimony of Mr. Reich, whom testified that he handed Defendant Henke cash in an envelope in his living room; this was strongly corroborated by the testimony of Mrs. Reich who witnessed the cash transaction. While this was a separate transaction and neither Mr. or Mrs. Reich witnessed the transaction on the thruway, Defendant Henke's credibility was significantly marred as to claiming he never accepted cash. Coupled with the fact that Plaintiff provided very detailed specifics of the transaction such as the day of the week, time of day, time of year, description of Defendant Henke's vehicle, and the general happenings of the transaction, the Court finds Plaintiff entitled to the return of the $10,000 under the theory of unjust enrichment.

Fourth, Plaintiff claims he is entitled to the return of $35,000 paid to Defendant Henke for the purchase of the 1958 Harley Davidson Panhead. Plaintiff testified he remembered Defendant Henke calling him on a Saturday night while Plaintiff was driving on the West Side Drive about a 1958 Panhead that was available to purchase from the wife of a deceased collector. Plaintiff testified he paid in two installments of $20,000 and $15,000, which was left with Mr. Reich at Top Dead Center and picked up by Defendant Henke. Defendant Henke testified that he never brokered a deal with Plaintiff for the 1958 Panhead, and he never received any cash from Mr. Reich for such motorcycle. After due deliberation and considering the testimony, as the trier of fact, the Court finds Plaintiff's rendition more credible than Defendant Henke. This is supported by the testimony of Mr. Reich whom averred he handed Defendant Henke cash at Top Dead Center on several occasions, including during the timeframe where Plaintiff claims the 1958 Panhead transaction occurred. Therefore, the Court finds Plaintiff is entitled to the return of the $35,000 under the theory of unjust enrichment.

The Court considered the arguments in Defendant Henke's post-trial submission regarding the submission of cash. Defendant Henke's affirmative defenses and legal and factual challenges to Plaintiff's proof were insufficient to warrant a different verdict. First, usage of "Google" searches to approximate the thickness of a stack of money is absurd, not presented at trial, and otherwise incompetent and inadmissible evidence. Second, the Court considered the cases submitted by Defendant Henke and notes that the issue of cash transactions boils down to credibility, wherein Plaintiff, Mr. Reich, and Mrs. Reich's credibility greatly eclipsed the credibility of Defendant Henke, Mrs. Henke, and Defendant Veverka. In fact, Defendant Henke and Defendant Veverka's credibility were even at odds with their own statements—both in trial and during their depositions.

As such, Plaintiff's fourth cause of action is granted against Defendant Henke, and he is entitled to a judgment of $164,500 for unjust enrichment.

### *Remaining Causes of Action in the Amended Complaint*

As for Plaintiff's first cause of action against Defendant Henke for breach of contract, seeking return of the subject motorcycles and the $164,500, the Court finds it unnecessary to discuss given that Plaintiff is fully compensated under the meritoriously stronger replevin/conversion and unjust enrichment causes of action. No party has proffered a contract, both admitted there were none, and both argued against the other's word as to whether there was a meeting of the minds for the work to be completed on the subject motorcycles.

As for Plaintiff's fifth cause of action, this was deemed abandoned as not developed fully at trial and not discussed in the post-trial submissions.

As for Plaintiff's sixth cause of action, this is dismissed as there is no recognized cause of action for punitive damages in New York. Under New York law, punitive damages "cannot be maintained as an independent cause of action" (*Calabrese Bakeries, Inc. v Rockland Bakery. Inc.*, 102 AD3d 1033, 1037 [3d Dept 2013]; *accord Rochester Linoleum & Carper Ctr. v Cassin*, 61 AD3d 1201, 1204 [3d Dept 2009] ["As for the punitive damages claim, such was improperly stated as a separate cause of action and was appropriate dismissed."]). This is consistent with the purpose of punitive damages. (*See Calabrese*, 102 AD3d at 1037, quoting *Rocanova v Equitable Life Assur. Socy of U.S.*, 83 NY2d 603 [1994] ["Punitive damages are not recoverable for an ordinary breach of contract as their purpose is not to remedy private wrongs but to vindicate public rights"].)

As for Plaintiff's seventh cause of action for an accounting, this is found unnecessary as Defendant Henke testified he remains in possession of the motorcycles and Plaintiff has established entitlement to the $164,500 figure he seeks in his post-trial submission. Should Defendant Henke fail to deliver the subject motorcycles, Plaintiff has leave to reapply for an accounting. The Court will also entertain punitive damages at that time, if necessary.

### Defendant Henke's Counterclaims

Defendant Henke asserts fifteen counterclaims in his Amended Answer. Counterclaims one through six seek compensation for the fair and reasonable value of the alleged work and labor performed on the various subject motorcycles. Defendant Henke provided copies of the invoices and avers he sent them to Plaintiff who has refused to pay. He also claims he performed certain tasks on each of the subject motorcycles he seeks compensation for his labor and services. He testified that Plaintiff and him had agreements for the work to be performed and the amount owed, including traveling to Ohio, but Plaintiff failed to honor those agreements.

Plaintiff avers that he had never seen any of the invoices until the litigation began. He also claimed that he did not authorize certain work to be performed by Defendant Henke on the subject motorcycles, particularly dissembling the two original blue motorcycles and preparing motorcycles to be restored for road use. As to the actual work allegedly performed, both Plaintiff and Mr. Reich—who owns a motorcycle repair shop—averred the allegedly labor and work was never performed. Several photographs were offered as evidence to support such claim. On cross-examination, Mr. Reich testified that he did not see the subject motorcycles prior to the alleged repairs, and did admit that there would be some rust and corrosion which would occur from the motorcycles sitting in storage for five to eight years, but not to the extent that was present. It was still his opinion no work had been performed on the subject motorcycles.

There is no contract and, as noted above for Plaintiff's alleged breach of contract claim there is an issue whether there was a meeting of the minds, Defendant Henke's claim to recover for his services is under an equitable theory for quantum meruit.[3] "A party may recover in quantum meruit in the absence of a written contract covering services performed upon showing "'(1) performance of services in good faith, (2) acceptance of the services by the person for whom they were rendered, (3) an expectation of compensation, and (4) the reasonable value of the services

---

[3] The pleadings are ambiguous as to the grounds, but are presented as one for quantum meruit.

performed'" (*Schwartz v Pierce*, 57 AD3d 1348, 1352 [3d Dept 2008], quoting *Precision Founds. v Ives*, 4 AD3d 589, 591 [3d Dept 2004] [internal citations omitted]).

Here, Defendant Henke has not established entitlement to any of the invoices and alleged services. First, his claims of performing certain services on the subject motorcycle are not credible. The photographs provided at trial revealed frayed wires, rust spots on areas he alleged to have treated, and rusted, sludgy gas caps and gas tank rims he claimed to have cleaned. Given that he was found to be lacking credibility, and that Mr. Reich was to be the most credible witness at trial, the Court cannot say Defendant Henke performed any of the alleged work. And if he did such work, it was quite poor and not of reasonable value to warrant the sought payment; what he claimed to do on the invoices did not match the work product.

Second, there is no evidence that Plaintiff accepted the work which Defendant Henke did perform—particularly the $5,400 for the travel purchase, breaking down the two original paint motorcycles, and restoring for road use. In fact, Defendant Henke's own invoice explicitly stated that Plaintiff only desired the motorcycles to be for museum demonstration—not road use. Yet, Defendant Henke testified at length all of the work he performed on the motorcycle to get it road ready, that he had it driving on the road, then placed it in storage "wet" which was the result of the extensive rust and corrosion. But he *knew* Plaintiff did not want the motorcycle for road use. Effectively, Defendant Henke defeated his own claims with his own documentary evidence. Therefore, counterclaims one through six are denied and dismissed.

Seven through fifteen seek compensation for fraud and false claims, but it is unclear whether this claims were previously dismissed by the IAS court; neither party mentioned there, nor was there a Decision and Order to this effect provided to this trial court.[4] Notwithstanding, proof for counterclaims seven through fifteen were simply not made out in the trial record, nor was it meaningfully articulated in Defendant Henke's post-trial submissions.

Therefore, all of Defendant Henke's counterclaims are denied and dismissed, in their entirety.

---

[4] Since it was not provided nor addressed by the parties, the Court avoided searching for any other decisions from the IAS court out of an abundance of caution that the extraneous issues presented therein may affect the Court's opinion and bias as to the parties and/or a delinquent party. Initially prior to the commencement of trial, the three parties mentioned there was a rather tortuous history of disclosure with somewhat extensive motion practice. Being that this Court was to be the ultimate finder of fact and coming with no knowledge of the prior issues herein, the Court did not delve into those issues or search for those decisions.

### *Conclusion*

To the extent not specifically addressed above, the parties' remaining contentions have been examined and found to be lacking in merit or rendered academic. Any claim(s) for attorneys' fees are denied since "attorneys' fees and disbursements are incidents of litigation and the prevailing party may not collect them from the loser unless an award is authorized by agreement between the parties or by statute or court rule" (*Matter of A.G. Ship Maintenance Corp. v Lezak*, 69 NY2d 1, 5 [1986]; *see Halstead v Fournia*, 134 AD2d 1269, 1271 [3d Dept 2015]). No such proof has been provided.

Since Plaintiff is the prevailing parties, he is entitled to all costs and disbursements related to this action.

Thereby, it is hereby

**ORDERED** that Plaintiff's second and third causes of action in the Amended Complaint (conversion and replevin) are **GRANTED**, and he is entitled to return of the subject motorcycles as detailed above from Defendant Henke within 10 business days of service of notice of entry, and Defendants, their agents, or any other individual or entity shall not destroy, de-value, disassemble, or otherwise manipulate or modify the subject motorcycles; and it is further

**ORDERED** that Defendant Henke, Defendant Veverka, and any other person, entity, or other individual maintaining possession of the subject motorcycles shall cooperate and provide Plaintiff reasonable access to his possessions for the purposes of gathering and removing them from the premises, with such removal and travel costs being at Plaintiff's own expense; and it is further

**ORDERED** that Plaintiff's fourth cause of action in the Amended Complaint (unjust enrichment) is **GRANTED**, and he is entitled to $164,500 from Defendant Henke and Defendant Henke Cycle Repair; and it is further

**ORDERED** that Plaintiff's remaining causes of action are **DENIED** and **DISMISSED**, as noted above, except Plaintiff shall have leave to reapply for an accounting should relief be applicable after the return of the subject motorcycles; and it is further

**ORDERED** that Defendant Henke's counterclaims are **DENIED**, and **DISMISSED** as noted above; and it is further

**ORDERED** that Plaintiff's counsel is hereby directed to provide the Court with a proposed Judgment, on notice, and not inconsistent with this Decision and Order, within 35 days of the date of Plaintiff's filing of the instant Decision and Order, including for costs, disbursements, and interest.

This constitutes the Decision and Order of the Court. Please note that a copy of this Decision and Order along with the original motion papers are being filed by Chambers with the County Clerk. The original Decision and Order is being returned to the prevailing party, to comply with CPLR R. 2220. Counsel is not relieved from the applicable provisions of this Rule with regard to filing, entry and Notice of Entry.

**IT IS SO ORDERED.**

DATED: January 9, 2017                    E N T E R :
      Catskill, New York


                               HON. LISA M. FISHER
                               SUPREME COURT JUSTICE

Papers Considered:

1) The Court considered all trial exhibits, the two pre-trial motions submitted to this trial court, written summations/closing argument, the trial transcript, and post-trial submissions made to Justice Lisa M. Fisher and this Court.